## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 27 2018, 9:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

A.S. (Minor Child)

and

K.S. (Mother),

*Appellant-Respondent,*

     v.

Indiana Department of Child Services,

*Appellee-Plaintiff*

February 27, 2018

Court of Appeals Case No.
69A01-1710-JT-2331

Appeal from the Ripley Circuit Court

The Honorable Ryan King, Judge

Trial Court Cause No.
69C01-1703-JT-8

**Altice, Judge.**

## Case Summary

K.S. (Mother) appeals from the involuntary termination of her parental rights to A.S. (Child). Mother argues that the trial court's order terminating her parental rights is not supported by clear and convincing evidence.[1]

We affirm.

## Facts & Procedural History

Mother began using illegal drugs in 2011. On October 9, 2013, Mother, who was then nineteen years old, gave birth to Child. After Child was born, Mother lived with her fiancé, who is not Child's biological father. Mother's fiancé is also a drug user and has a pending charge for sexual misconduct with a minor.

When Child was three months old, Mother introduced Child to her paternal great-grandparents, D.Z. and W.Z. Mother would regularly leave Child with different caregivers, including her mother or sister, but most often she left Child in the care of the paternal great-grandparents for days or even weeks at a time. Mother would return only for a day or two and then leave again. When Mother left Child with the paternal great-grandparents, she would not bring food, money, authorization to obtain medical care, or sufficient and appropriate

---

[1] Father signed a voluntary consent to termination of his parental rights to Child. Father does not participate in this appeal.

clothing for Child. The paternal great-grandparents were Child's primary caregivers.

[5] As an example of Mother's unwillingness to care for Child, D.Z. recounted an instance when she had become ill, so W.Z. contacted Mother and asked her to pick up Child so D.Z. could rest and recover. Mother, however, did not pick up Child, claiming she was taking a trip to New York. On another occasion, D.Z. contacted Mother because Child was very sick. Mother told D.Z. to take her to the hospital. Mother, however, did not meet them at the hospital and never called to see how Child was doing. D.Z. also made sure that Child was seen regularly by a doctor and received her vaccinations and she did so despite the fact that Mother never provided her with Child's Medicaid card.

[6] When Child was around two-and-a-half years old, D.Z. noted that Child had a bruise on her face, as well as a black eye and a scratch on her cheek. When D.Z. confronted Mother about her concern of physical abuse, Mother admitted that she left Child in the care of her fiancé while she ran errands and that when she got home and heard Child screaming, her fiancé told her that Child must have fallen out of bed. Mother was adamant that her fiancé would never hurt Child.

[7] D.Z. also had concerns about possible sexual abuse. She noted something unusual about the appearance of Child's vagina and that, although Child was potty trained, Child would have accidents or hide beside a bed to defecate after she had spent time with Mother. D.Z. took Child to the doctor and then the

hospital to determine if Child had been sexually abused. Mother attended only one of these appointments.

[8] D.Z. had also become concerned that Mother was using drugs. She noted that Mother's appearance and behavior had changed and that she had become forgetful. She recounted how on a cold winter day, Mother, claiming she had run out of time, failed to dress Child in anything more than a diaper.

[9] In January 2016, it was reported to the Department of Child Services (DCS) that Mother violated her probation by having a positive drug screen. Mistakenly believing it was D.Z. who contacted DCS, Mother picked Child up from the D.Z.'s home and told her that she would never see Child again. After Mother left with Child, D.Z. contacted DCS. On January 21, 2016, DCS located Child at maternal grandmother's home. Mother was not present, maternal grandmother was under the influence of drugs, and drugs were found in the home. DCS filed a request for emergency custody, which the court granted.

[10] On January 22, 2016, DCS filed a Verified Petition Alleging Child to be in Need of Services (CHINS). Child was initially placed in the care of D.Z. Angela Davis, the Family Case Manager (FCM) assigned to Mother, was unable to track Mother down for nearly a month, finally getting in touch with her by phone on February 24, 2016. FCM Davis noted that during the conversation, Mother was slurring her words and was very emotional, leading her to believe that Mother was using drugs. Mother also indicated to FCM

Davis that she would not participate in supervised visits with Child even though FCM Davis explained that such was required given Mother's drug use. Mother also refused to discuss or plan for services offered to help reunify her with Child. Subsequently, when a service provider contacted Mother to arrange a supervised visit, Mother was rude and dismissive.

[11] On March 13, 2016, Mother appeared for an initial hearing in the CHINS matter and was appointed counsel, but she failed to personally appear for a May 9, 2016 fact-finding hearing. On May 11, 2016, the court adjudicated Child a CHINS. Mother did not attend a dispositional hearing held on May 23, 2016, and there was an outstanding warrant for her arrest. In its dispositional order, the trial court ordered Mother to stop using drugs, complete a substance abuse assessment and follow all recommendations, and submit to random drug screens. At the time, the permanency plan was reunification.

[12] During the pendency of the CHINS matter, Mother spent time in jail on several occasions. From March 14 through March 21, 2016, Mother was incarcerated in the Ripley County Jail for a probation violation after submitting a positive probation drug screen. Two days after her release, Mother tested positive for a heroin metabolite. Five days after that, March 28, 2016, Mother tested positive for amphetamines and morphine. Based on her continued drug use, a second probation violation was filed on March 30, 2016, and a warrant was issued for her arrest. Before this arrest warrant was executed, however, Mother was arrested in May 2016 in Johnson County for possession of methamphetamine and possession of a narcotic drug (heroin) and was incarcerated for two days.

She later pled guilty to the charges and was sentenced to 910 days, all suspended but for time served.

[13]     In June 2016, Mother admitted to violating her probation as alleged in the second probation violation and the court revoked 180 days of her previously suspended sentence in Ripley County, but stayed the sentence pending Mother's completion of an inpatient stay at Tara Treatment Center. Mother was released from treatment on July 1, 2016, but failed to attend the intensive outpatient treatment program recommended by FCM Davis. Rather, Mother chose to live with her mother and sister, both of whom were active methamphetamine users. On or about July 19, 2016, Mother cooperated with a DCS request for a drug screen, testing positive for methamphetamine. On July 20, Mother again tested positive for amphetamines during a random probation drug screen. As a result, a third violation of probation was filed. Mother admitted to violating her probation by using illegal drugs, and the trial court revoked 185 days of her probation. Mother remained in jail until October 2016.

[14]     Mother failed additional drug screens that were administered by DCS. On November 10, 2016, prior to a supervised visit with Child, Mother tested positive for methamphetamine. In March 2017, FCM Davis offered Mother treatment at a center in Evansville and asked Mother to come in for a phone interview and a drug screen. Mother, however, refused to cooperate, despite being informed that her refusal would be considered a "dirty screen." *Transcript* at 48. Mother's response was that "one more screen wasn't going to hurt her" and then she hung up the phone. *Id*. On April 21, 2017, prior to a supervised

visit with Child, Mother again tested positive for methamphetamine. FCM Davis testified that it was difficult to test Mother more regularly because her whereabouts were often unknown and she did not keep in touch with DCS.

[15] Mother was arrested on May 2, 2017, pursuant to an arrest warrant issued after she failed to appear for probation appointments in Johnson County. On May 30, 2017, Mother's Johnson County probation was revoked. Mother has been incarcerated since that time and is anticipated to remain incarcerated until mid-2018, unless her sentence is modified.

[16] With regard to visitation, the record reveals that from January 21, 2016, until the time of termination, Mother visited with Child only five times, despite numerous referrals for weekly supervised visits. Of the five visits, two of them occurred because the visitation supervisor took Child to see Mother while she was at the Tara Treatment Center. FCM Davis also made referrals for Mother to participate in home-based services, but Mother would not participate or maintain contact with FCM Davis so arrangements for the services could be made.

[17] At a January 9, 2017 permanency hearing, the court found that Mother had not been compliant with services and approved changing the permanency plan from reunification to adoption. Thereafter, DCS filed a Verified Petition for the Termination of the Parent-Child Relationship (TPR Petition) on March 29, 2017. Even though Mother failed to appear at the initial hearing on the TPR Petition, the trial court appointed counsel to represent her. On August 14,

2017, Mother requested that counsel withdraw his appearance, which motion the court denied. The court held a fact-finding hearing on the TPR Petition on August 29, 2017. On September 7, 2017, the court entered its order terminating Mother's parental rights. Mother now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[18] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[19] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous

only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[20] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[21] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[22] Mother first challenges the trial court's findings as to subsections (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, the trial court found that DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in Child's removal or continued placement outside Mother's care will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in Child's removal or continued placement outside Mother's care will not be remedied.

[23] In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's

habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In making this determination, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[24] The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210. Moreover, the failure to exercise parenting time demonstrates a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." *Lang*, 861 N.E.2d at 372 (*quoting In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)) (alteration in original).

[25] In its order terminating Mother's parental rights to Child, the court detailed Mother's continued drug use, her criminal history, her failure to visit Child or participate in services during the pendency of the CHINS action, and her lack of employment and stable housing. Indeed, as noted by the court, by the time of Mother's last arrest, she was a frequent user of methamphetamine and heroin. After Child was removed from Mother, Mother was arrested and incarcerated several times, and yet she resumed using drugs after each

detention. Mother did not cooperate with FCM Davis and she completed no CHINS-related services. Mother did complete a three-week inpatient treatment program, but did so to avoid serving six months in jail. Since Child's removal, Mother visited with Child only five times, two of which happened because a service provider took Child to see Mother. Prior to at least two other visits, Mother tested positive for drugs.

[26] Mother's pattern of continued drug use, her repeated arrests and violations of probation that are directly related to such drug use, and her failure to visit Child or participate in any services all demonstrate that Mother is unwilling or unable to take the steps necessary to be an adequate parent for Child. The trial court was not required to credit Mother's testimony at the TPR Hearing that she is now ready to overcome her addiction and parent Child. The trial court's finding that there is a reasonable probability that the conditions resulting in Child's removal or continued placement outside Mother's care will not be remedied is not clearly erroneous.

[27] Mother also challenges the court's finding that termination is in Child's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d

185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[28] Mother argues that the court's determination that termination is in Child's best interests was clearly erroneous because it was based on the court's speculation that Mother would relapse after completing drug treatment and being released from jail. We disagree. The trial court's determination that termination was in Child's best interests was not based solely on speculation that Mother would relapse. While the trial court recounted in detail Mother's continued drug use, the court also considered Mother's failure to participate in supervised visits and services offered by DCS. The court also considered testimony from Child's pediatrician that Child suffers from PTSD and has an attachment disorder and that it is imperative that Child be placed in a safe and stable home. The trial court summarized Child's pediatrician's testimony, noting that Child "is at a critical age in her brain development where there still exists a possibility that [she] can overcome her mental illness and thrive" if placed in the appropriate, therapeutic environment that was being provided by Child's adoptive foster family. *Appellant's Appendix* at 15.

Further, we have already concluded that the evidence is sufficient to support the court's finding that the conditions resulting in Child's removal and continued placement outside Mother's care will not be remedied. In addition, Child's pediatrician, FCM Davis, and Child's court appointed special advocate all recommended termination of Mother's parental rights. This is sufficient standing alone to support the court's finding that termination is in Child's best interests. The court's determination that termination of Mother's parental rights is in Child's best interests is not clearly erroneous.

Judgment affirmed.

May, J. and Vaidik C.J., concur.